IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SCOTT M. CHESTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. CIV-16-433-R |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying his applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be reversed and remanded for further proceedings.

I. Background

Plaintiff filed his most recent applications for benefits on April 29, 2013 (protective filing date). Plaintiff alleged that he became disabled on March 1, 2007, due to scoliosis, emphysema, hypertension, neurofibromatosis, anxiety disorder, and learning disorder.

1

Plaintiff has a twelfth grade education and previous work as a stocker, repair service writer, security guard, and cabinet maker.

Plaintiff has an extensive history of medical problems related to neurofibromatosis, type 1. As described by Dr. Sweet-Darter, a psychologist at the University of Central Oklahoma's Learning and Behavior Clinic who evaluated Plaintiff in June 2013, Neurofibromatosis, Type I, a genetic disorder,

> results in neuromas (tumors) at any place along the central nervous system. Most people are aware of the small and large neuromas that appear on the skin of people with Neurofibromatosis but few are aware that many of the neuromas are internal and include the human brain, which is a significant part of the central nervous system. In particular, most cases involve nerve damage in the right hemisphere, particularly in the right frontal lobe. The result is impaired mental organization diagnosed as Executive Dysfunction and is caused by neuromas on the neural pathways in the frontal lobes.
> In addition to frontal lobe impairment, the neuromas can attack the lungs, the spine, the fine motor system (which relies on accurate neurological messages), the optic nerve, and anywhere a nerve is found in the human body. Scott's medical history is a classic example of Neurofibromatosis, Type 1. As an infant (1973), he had a heart defect requiring open-heart surgery. Mild Hydrocephaly was evidenced (fluid in the brain resulting in swelling in the brain). In 1990 and 1991, he required lung surgery, because fibrosis of the pleura and congestion of the parenchyma resulted in the collapse of one lung then the other. The diagnosis of Bullous Emphysema and the surgery entailed removing the pleural linings and fusing his lungs to his chest wall to prevent future collapses. The diseased part of each lung was folded back and stapled to the chest wall. The result is essentially no pleural lining around Scott's lungs; thus, expansion and contraction is labored. As if that wasn't enough, Scoliosis has limited his body flexibility. Recent medical tests indicate his scoliosis has worsened and he has lost 4 inches of height over a period of years. The compaction of the discs has worsened as well as the configuration of his spinal column.

> In 1995, hernia surgery was required and in 2003, a Lower GI Bleed-Out occurred resulting in surgery. Over the years, numerous tumor removals were performed as well as surgery to repair a retinal tear due to optic nerve damage. . . . Again, all these complications are commonly ones related to Neurofibromatosis, Type I. Type II does not involve tumors on the nervous system; thus Type I is the more devastating of the two types and is typically accompanied by cognitive impairment of some type (most frequently, frontal lobe impairment resulting in Executive Dysfunction).

(TR 409-10). Following an extensive evaluation of Plaintiff's cognitive functional ability, Dr. Sweet-Darter diagnosed Plaintiff with Executive Dysfunction characterized by "significant weaknesses in Processing Speed" and significant impairment "in his ability to shift his attention, control emotions in a problem-solving situation, initiate a plan, and self-monitor his own thoughts and actions." (TR 416-17). Related to his impairment in processing speed, Plaintiff exhibited a fourth grade reading comprehension level and a very slow reading rate. (TR 417). Dr. Sweet-Darter concluded that Plaintiff's "cognitive processing should likely be monitored along with the physical health because his neurological-based physical condition appears to be worsening and his cognitive processing may follow a similar course." (TR 417).

Beginning in December 2010, Plaintiff has been treated at the Neurofibromatosis Clinic at the University of Oklahoma Health Sciences Center ("OUHSC"). Plaintiff has also been treated at a free medical clinic in his hometown of Clinton, Oklahoma, where he lives with his mother, and by Dr. Long, a family physician. Dr. Long's office notes reflect treatment of Plaintiff beginning in June 2013 for anxiety disorder, chronic pain due to neurofibromatosis and scoliosis, gastrointestinal reflux disorder, and hypertension. Dr. Long

prescribed anti-depressant and anti-anxiety medication and pain medication for Plaintiff.

In May 2013, Ms. Taylor, a physician's assistant at Plaintiff's treating OUHSC Neurofibromatosis Clinic, examined Plaintiff and noted that Plaintiff exhibited severe scoliosis and an awkward gait with his left foot rotated out while walking and hip tilt. (TR 397). He complained of back and joint pain, shortness of breath, fatigue related to his medications, and sleeping problems. Plaintiff also exhibited multiple neurofibromas including a plexiform neurofibroma on the right side of his chest and tender neurofibromas on the bottom of his feet. He was taking medications for hypertension, anxiety, and pain. Ms. Taylor opined that Plaintiff "is unable to work due to complications related to NF 1." (TR 399).

In August 2013, Dr. Mulvihill, the Chair of Genetics at OUHSC and a professor of pediatrics at OUHSC, authored a letter in which Dr. Mulvihill stated that Plaintiff was a patient in OUHSC's genetics clinic. Dr. Mulvihill outlined Plaintiff's extensive medical history and provided the following objective findings:

> [c]urrently, Scott has neurofibromas in his spine . . . . On physical examination, he has multiple neurofibromas over his trunk and extremities. He has a plexiform neurofibroma on the right side of his chest. It is important to monitor the plexiform neurofibroma regularly due to risk for malignant transformation. He has neurofibromas on the bottom of his feet that make it very difficult to walk. Scott has severe scoliosis, another manifestation of NF1. His scoliosis has become progressively worse and his height continues to decrease as the scoliosis worsens. This is painful and limits his flexibility. He has an awkward gait related to the scoliosis. The scoliosis is also contributing to lung restriction and shortness of breath. Scott suffers from bullous emphysema, another rare complication of NF1. Scott had multiple spontaneous pneumothoraces and

> required both right and left lung surgeries. He continues to have shortness of breath and recent pulmonary function studies show some limitations in his pulmonary function. Furthermore, Scott has limited processing ability as identified by psychology. He was shown to have deficient executive function as well as deficient visual-spatial integration and deficient short and long term visual ability. It is known that about 50-75% of patients with NF1 can have some type of learning or cognitive disability.

(TR 436).

In March 2014, Dr. Mulvihill authored a second letter in which Dr. Mulvihill stated that Plaintiff was a "patient at our Neurofibromatosis Clinic" at OUHSC and that his "colleagues have personally examined Mr. Chester, reviewed his case with me, and [I reviewed] all of the medical records that are enumerated in my letter of August 28, 2013." (TR 447). In this letter, Dr. Mulvihill opines that

> [c]onsidering [Plaintiff's] complicated health issues related to, but not limited to, neurofibromatosis (NF1), scoliosis, bullous emphysema, and open-heart surgery (VSD repair), it is my opinion that since at least 2010 Mr. Chester would have been limited in his ability to function both in his daily activities as well as any occupational activities. His stamina would have been limited due to the emphysema, and with his pain from the NF1 and scoliosis, he would not have been able to consistently complete an 8-hour workday 40-hour work-week without missing work and or having to be absent from his workplace. It is my opinion that he would have required, and would require, one to three hour breaks during an 8-hour workday and that he would periodically not been able to even attend work, possibly, one to two days per week because of his conditions. There is the additional complication of his impaired executive function, visual spatial integration and short-term and long-term memory impairments (per the psychological evaluation of Dr. Mary Sweet-Darter of June 21, 2013). He would have had problems with any occupation that required achieving quotas without special supervision. It is my medical opinion that these limitations would have existed at least as of 2010.

5

(TR 447). The record contains an extensive report of a follow-up examination of Plaintiff by Dr. Mulvihill in April 2014. (TR 499-502).

Consistent with these medical opinions, the record contains a report of a consultative examination of Plaintiff by Dr. Young in August 2013. In this report, Dr. Young opines:

> The claimant has neurofibromatosis type 1 and multiple other problems related to his main diagnosis. Specifically, the claimant has hundreds of neurofibromas covering his whole body some as large as 10 cm in diameters. These neurofibromas are painful to the touch especially on certain locations [and] cause great physical impairments such as the neurofibromas on the bottom of his left foot and the neurofibromas on his tailbone. He also has scoliosis which impedes his gait and makes it painful to sit or stand for long period[s]. It also impairs his ability to take deep breath[s] and is one of the causes he has been told of his $CO_2$ retention. He has bullous emphysema, which is another reason that he has shortness of breath and poor exercise tolerance. He also has poor executive functioning related to his NF that makes it difficult for him to carry out complex tasks or follow even simple sets of instructions.

(TR 439-40).

In addition to these medical opinions, Dr. Long stated in a letter dated April 22, 2014, and again in a letter dated May 11, 2015, that Plaintiff had been a patient in Dr. Long's clinic since June 2013, and that Plaintiff was disabled prior to being evaluated in the clinic due to "multiple neurofibromas (both internal and external), scoliosis, bullous emphysema, and other complications related to Neurofibromatosis I" as well as the adverse effects of his prescription medication. (TR 503, 632). Dr. Long opined that Plaintiff's "condition will not improve due to his neurofibromatosis 1 (NF1) and other severe health issues." (TR 632).

In pulmonary function testing conducted by Dr. Jones at the OU Physicians

6

Pulmonary Function Laboratory in May 2013, Dr. Jones found that Plaintiff's lungs showed moderately severe obstructive defect. (TR 432-33). X-rays of Plaintiff's spine taken in May 2013 were interpreted as showing "fairly marked" rotoscoliosis of the upper lumber and lower thoracic spines. (TR 394).

In a consultative physical examination of Plaintiff conducted in February 2008, Dr. Robinson opined that Plaintiff could sit for about six hours and walk less than two hours in an eight-hour workday, frequently lift ten pounds, occasionally lift 20 pounds, and he had "postural limitations on bending, stooping, and crouching" as well as "manipulative limitations on frequent reaching. . . ." (TR 353-354).

In a consultative psychological evaluation of Plaintiff conducted by Dr. Danaher in January 2011, Dr. Danaher reported a diagnostic impression of adjustment disorder with mixed features of anxiety and depression. Regarding Plaintiff's mental work-related abilities, Dr. Danaher opined that Plaintiff's ability to understand, remember and carry out simple and complex instructions in a work-related environment was "fair." (TR 367).

In an administrative hearing conducted before Administrative Law Judge Belcher ("ALJ") in September 2014 (TR 38-86), Plaintiff testified that he was 41 years old and had no source of income other than food assistance. Plaintiff testified that his pain medication caused drowsiness, requiring him to sleep for about an hour within a couple of hours after taking it. Plaintiff testified that he stopped working in 2007 because of pain due to scoliosis and neurofibromatosis. Plaintiff stated that he had tumors caused by this condition all over his body for "pretty much all my life," including on his tailbone, hands, and the bottoms of

7

his feet, and that the tumors were painful and interfered with his ability to sit, stand, walk, and grip objects. (TR 53-58). Plaintiff testified that since his lung surgeries in 1990 and 1991 he has shortness of breath. Plaintiff also described difficulty with comprehension and concentration. Plaintiff's mother and a vocational expert ("VE") also testified at the hearing. His mother testified concerning Plaintiff's physical and cognitive difficulties and stated that she paid for his medical treatment.

The ALJ found that Plaintiff met the insured status requirements for disability insurance benefits through June 30, 2012, had not worked since March 1, 2007, and had severe impairments due to "neurofibromatosis, scoliosis, bulbous [sic] emphysema, hypertension, and adjustment disorder with mixed features of anxiety and depression." (TR 92). The ALJ next found that Plaintiff had the residual functional capacity ("RFC") to:

> lift and carry 10 pounds occasionally and less than 10 pounds frequently. The claimant can sit for about six hours during an eight-hour workday and can stand and walk for at least two hours during an eight-hour workday. The claimant can occasionally climb, balance, stoop, kneel, crouch and crawl. The claimant is to avoid concentrated exposure to dust, fumes, gases, orders [sic], and poor ventilation. The claimant can understand, remember, and carry out simple, routine, and repetitive tasks. The claimant can respond appropriately to supervisors, coworkers, the general public, and usual work situations.

(TR 94). Relying on the VE's testimony at the hearing, the ALJ found that this RFC precluded the performance of Plaintiff's past work but allowed him to engage in jobs available in the national economy, and specifically the jobs of "clerical mailer" and "surveillance system monitor." (TR 31). Considering these findings, the ALJ concluded that

Plaintiff was not disabled within the meaning of the Social Security Act and not entitled to benefits.

The Appeals Council denied Plaintiff's request for review. Therefore, the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

II. General Legal Standards Guiding Judicial Review

The Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

The Social Security Act authorizes payment of benefits to an individual with disabilities. 42 U.S.C. § 401 *et seq*. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord, 42 U.S.C.

§ 1382c(a)(3)(A); see 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than twelve months. Barnhart v. Walton, 535 U.S. 212 (2002).

The agency follows a five-step sequential evaluation procedure in resolving the claims of disability applicants. See 20 C.F.R. §§ 404.1520(a)(4), (b)-(g), 416.920(a)(4), (b)-(g). "If the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to perform other work in the national economy in view of her age, education, and work experience." Fischer-Ross v. Barnhart, 431 F.3d 729, 731 (10th Cir. 2005). "The claimant is entitled to disability benefits only if he [or she] is not able to perform other work." Bowen v. Yuckert, 482 U.S. 137, 142 (1987).

III. Reopening Prior Administrative Decision

Plaintiff asserts in his opening brief that the ALJ erred in refusing to reopen Plaintiff's prior disability application because Plaintiff presented "new and material evidence [that] would support such a re-opening." Plaintiff's Opening Brief, at 20. Plaintiff refers to a letter from his high school counselor, his mother's testimony at the administrative hearing, and the report of the June 2013 psychological evaluation of Plaintiff conducted by Dr. Sweet-Darter. Plaintiff argues that this new evidence confirms his "intellectual and academic difficulties had existed since childhood." Id.

The regulations allow a previous decision to be reopened in certain circumstances,

including "[w]ithin four years of the date of the notice of the initial determination if we find good cause, as defined in § 404.989, to reopen the case." 20 C.F.R. § 404.988(b). Good cause is defined as "new and material evidence," a "clerical error in the computation or recomputation of benefits, or when "evidence that was considered in making the determination or decision clearly shows on its face that an error was made." 20 C.F.R. §404.989.

In his decision, the ALJ addressed Plaintiff's request to reopen a prior Administrative Law Judge's decision entered March 21, 2012. The ALJ found that this decision was a final decision as the Appeals Council had denied the request to review the decision on March 29, 2013. The ALJ found there was no good cause to reopen the previous decision, rendering the prior decision "binding under the doctrine of *res judicata.*" (TR 15). Consequently, the ALJ concluded that "[t]he relevant period in this case . . . is from March 22, 2012 through the date of this decision." (TR 15).

This Court generally has no jurisdiction to review the Commissioner's decision refusing to reopen Plaintiff's previous application for disability benefits. See Brown v. Sullivan, 912 F.2d 1194, 1196 (10th Cir. 1990)(holding Secretary's decision not to reopen a previously adjudicated claim for benefits is discretionary and therefore not a final decision reviewable under 42 U.S.C. § 405(g))(citing, e.g., Califano v. Sanders, 430 U.S. 99, 107-09 (1977)).

Review of Plaintiff's medical history in connection with his most recent application does not amount to *de facto* reopening of the prior decision. See Hamlin v. Barnhart, 365

F.3d1208, 1215 n. 8 (10th Cir. 2004)(review of medical reports from previously adjudicated period is relevant to claimant's medical history and does not implicitly reopen earlier claim); McLeroy v. Barnhart, 2006 WL 4046154, *7 (D.Kan. 2006)(where ALJ clearly declined to reopen previous adjudication, examination of medical evidence from earlier adjudicated period did not reopen earlier claim).

Unless Plaintiff has alleged a "colorable constitutional claim," he cannot obtain judicial review of the ALJ's decision not to reopen the previous decision. 20 C.F.R. §416.1403(a)(5); Blair v. Apfel, 229 F.3d 1294, 1295 (10th Cir. 2000)(*per curiam*). Plaintiff argues that he has raised a colorable constitutional issue regarding his mental impairment, which he alleges prevented him from understanding his right to appeal the previous administrative decision. Plaintiff's high school counselor authored a letter dated September 25, 2014, in which she reported that although Plaintiff had difficulty processing information and needed explanation of instructions in simpler terms Plaintiff had "diligently strived" to obtain passing scores in order to graduate despite health issues and major lung surgery in April of his senior year. (TR 321-22). Plaintiff's mother testified at the administrative hearing that he had difficulty with reading comprehension and she had to assist him with academic studies in order for him to "bring his Fs up to Ds to at least pass" his senior year. (TR 68). Plaintiff's mother testified that Plaintiff continued to have problems with thought processing, reading comprehension, and focusing after he began living with her in 2010. (TR 69). Dr. Sweet-Darter's observations and findings in the June 2013 report of her extensive psychological evaluation of Plaintiff concerning Plaintiff's significant cognitive dysfunction,

including his fourth grade reading comprehension level, related to his neurofibromatosis were previously summarized. Further, Dr. Danaher, consultative psychological examiner, and Dr. Scott, a second consultative psychological examiner, both reported that Plaintiff had only a "fair" ability to understand, remember, and carry out simple and complex instructions in a work-related environment. (TR 367, 427). In the prior administrative proceeding, Plaintiff was represented by a non-attorney who would not have been able to proceed with an appeal of the final decision of the Commissioner. The Appeals Council's notice of action in Plaintiff's prior administrative proceeding was dated March 29, 2013. (TR 103). Plaintiff protectively filed his most recent application on April 29, 2013, just one month later. Having considered the evidence, the undersigned finds Plaintiff has presented a colorable constitutional claim. There is some evidence in the record indicating that Plaintiff's mental impairments may have prevented him from pursuing an appeal of the previous administrative decision in federal court, particularly in light of the fact that he had 60 days from the date of the Appeals Council's notice of action to file a civil action in federal court, but he instead filed another administrative application in just 30 days. Thus, the Commissioner's final decision should be remanded to the Commissioner for further proceedings concerning this issue.

IV. <u>Evaluation of Medical Opinions</u>

Plaintiff contends that the ALJ failed to properly evaluate the opinions of his treating physicians, Dr. Mulvihill and Dr. Long. The ALJ rejected these physicians' opinions. The ALJ stated that "Dr. Mulvihill did not treat the claimant prior to April 22, 2014." (TR 26).

13

Even if Dr. Mulvihill had not personally examined Plaintiff at the time he authored his letter opinions in August 2013 and March 2014, Plaintiff had previously been examined and treated by a physician's assistant at the treating clinic, Dr. Mulvihill examined Plaintiff in April 2014, and therefore he should have been considered a treating physician. Additionally, Dr. Mulvihill is a specialist and pre-eminent expert in the field of genetics disorders. Pursuant to 20 C.F.R. § 416.927(c)(5), the opinion of a specialist is entitled to more weight than the opinion of a source who is not a specialist. Moreover, "all evidence from nonexamining sources" is to be considered "opinion evidence" under the agency's regulations. 20 C.F.R. § 416.927(e).

The more obvious error, though, is the fact that the ALJ provided various reasons for discounting or rejecting the opinions of Plaintiff's treating medical and mental health professionals, including the opinions by Dr. Mulvihill, Dr. Long, Dr. Sweet-Darter, and the consultative examiners, while not once considering the fact that all of those opinions were entirely consistent with each other in their assessment of Plaintiff's impairments. The opinions documented objective findings of Plaintiff's significant and severe physical and mental impairments.

For instance, Dr. Young, a consultative examiner, noted that Plaintiff's neurofibromas "covering his whole body" were "painful to the touch" and caused "great physical impairments such as the neurofibromas on the bottom of his left foot and the neurofibromas on his tailbone." (TR 439). Dr. Young noted that Plaintiff "also has scoliosis which impedes his gait and makes it painful to sit or stand for long period[s]" and "impairs his ability to take

deep breath[s]." Dr. Young further noted that Plaintiff also "has bullous emphysema" that "is another reason that he has shortness of breath and poor exercise tolerance," and he has "poor executive functioning related to his NF that makes it difficult for him to carry out complex tasks or follow even simple sets of instructions." (TR 439-40). In the face of these observations of severe physical and mental impairments that are entirely consistent with the opinions of Dr. Mulvihill and Dr. Long that Plaintiff's impairments render him unable to work, the ALJ found that Dr. Young's "medical opinion [was] fully consistent with my residual functional capacity finding" and gave it "significant weight." (TR 28). There is simply not substantial evidence in the record to support the ALJ's rejection of the consistent medical opinions appearing in the record. Consequently, the Commissioner's decision should be reversed and remanded for further administrative proceedings.[1]

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter REVERSING the decision of the Commissioner to deny Plaintiff's applications for benefits and REMANDING the matter to the Commissioner for further administrative proceedings. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before    November 16th   , 2016, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421,

---

[1] In light of the above, the undersigned declines to review Plaintiff's remaining arguments.

1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this   27th   day of   October  , 2016.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE